UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LUIS FERNANDEZ | : | PRISONER |
| | : | NO.: 3:02CV2090 (JBA)(JGM) |
| v. | : | |
| | : | |
| CHIEF ROBERT PAQUETTE, ET AL | : | JANUARY 26, 2004 |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.  FACTUAL BACKGROUND

The above matter stems from the execution of a search and seizure warrant on January 7, 2000.  The warrant, issued at Danbury Superior Court upon the review and signature of a neutral magistrate, specifically lists the place to be searched as the second floor apartment located at 128 Osborne Street.  (Local Rule 56(a)1 Statement ¶ 2).  The warrant also names one 'Angel Ramirez' under that portion of the warrant entitled "search the person described in the foregoing affidavit and application, to wit". (56(a)1 Statement ¶ 2).  The gravamen of the plaintiff's complaint essentially amounts to a claim that the defendants violated the Fourth Amendment by arresting him without first establishing probable cause.  This suit is entirely frivolous, as the plaintiff's arrest was the product of a five-month investigation, during which the defendant officers and detectives meticulously recorded and documented evidence establishing probable cause for the plaintiff's arrest on January 7, 2000.

Luiz Fernandez, the pro se plaintiff, was also a resident of the 128 Osborne residence, as well as the second target of the investigation leading to the issuance of the warrant. Prior to the execution, and during the entire duration of the investigation, Mr. Fernandez had been identified by his alias, "Alex".  (56(a)1 Statement ¶ 9).  "Alex" was clearly the other key 'target' of the investigation, and is repeatedly named and referenced throughout the entire warrant Affidavit and Application. (**Exhibit A**)  Mr. Fernandez's given name was not confirmed until after the search warrant had been executed, effectively being confirmed by photo identification, in the form of a passport

and driver's license, found at the 128 Osborne apartment, and during a 'reverse sting' operation. (See 56(a)1 Statement).

### A.    Initiation Of The Five-Month Investigation.

The aforesaid warrant was the product of a five-month investigation, initiated in July of 1999. (56(a)1 Statement ¶ 3). During this investigation, Detectives Trohalis and Merullo retained the services of two confidential informants, reliable and known to the defendants for several years, to monitor the sale of cocaine from the 128 residence. (56(a)1 Statement ¶ 5). During the course of the investigation, using the services of the two aforesaid reliable, confidential informants, the defendant police officers and detectives made five controlled purchases of cocaine from Mr. Ramirez and Mr. Fernandez, the last purchase occurring just prior to the execution of the warrant, during the first week of January, 2000. (56(a)1 Statement ¶ 6). Three of these controlled purchases were conducted with Mr. Ramirez. Four of these controlled purchases were conducted with Mr. Fernandez. On multiple occasions, the informants and defendant detectives observed both men, Mr. Fernandez and Mr. Ramirez, jointly conducting the sale of cocaine as well as exiting and entering the second floor apartment at the 128 Osborne Street address. (56(a)1 Statement ¶ 6).

The defendant, Chief Robert Paquette, did not have any personal involvement in the five-month investigation, in the application process for the search warrant, or in the execution of the search warrant and the subsequent arrest of the plaintiff on January 7, 2000. (56(a)1 Statement ¶ 4; Affidavit of Chief of Police Robert Paquette).

### B.    The First Controlled Purchase From Luis Fernandez and Angel Ramirez.

The investigation was initiated on July 28, 1999, when Detective Trohalis met with the first informant, 'Informant #1'. Informant #1 told Detective Trohalis that he had personal knowledge that a Hispanic male, known to Informant #1 as "Sandy", was currently selling cocaine in the city of Danbury. (56(a)1 Statement ¶ 9). He also stated that "Sandy" worked with a partner, known to Informant #1 as "Alex", and that both men conducted the sale of cocaine through use of a pager, number 289-4343 ('the pager'). (56(a)1 Statement ¶ 9). The informant also told Detective Trohalis that he had purchased cocaine from "Sandy" and "Alex" on numerous prior occasions during the

2

recent past. (56(a)1 Statement ¶ 10). "Sandy" was later identified during the course of the investigation as Angel Ramirez. (56(a)1 Statement ¶ 30).

After receiving this information, Informant #1 was asked to make a controlled purchase of cocaine from "Sandy" and "Alex" on the same date, July 28, 1999. (56(a)1 Statement ¶ 11). Informant #1 contacted "Sandy" using the pager #289-4343, and met "Sandy" at a specific location. (56(a)1 Statement ¶ 12). Informant #1 was under constant surveillance by Detectives Trohalis and Ramos during the entire controlled purchase. (56(a)1 Statement ¶ 13). After a short time a brown Honda Accord, bearing Connecticut registration 388NJY ('the Honda'), arrived at the designated location. (56(a)1 Statement ¶ 14). After the Honda pulled away, Informant #1 met with Detectives Trohalis and Ramos, and turned over a prepackaged quantity of white powder. (56(a)1 Statement ¶ 14). The informant stated that "Alex" was driving the Honda and that "Sandy" was in the passenger seat of the Honda. (56(a)1 Statement ¶ 15). The detectives field tested the packaged white powder and determined that it was cocaine. (56(a)1 Statement ¶ 16).

### C.    The Second Controlled Purchase From Angel Ramirez.

During the third week of October 1999, Detective Trohalis met with the second informant, Informant #2. Informant #2 has been known to Detective Trohalis and other members of the Danbury Police Special Investigation unit for more than nine years. (56(a)1 Statement ¶ 17). During these nine years, Informant #2 had provided information that later proved true and accurate during the course of investigation. (56(a)1 Statement ¶ 17). Informant #2 also told the defendant detectives and police officers that he had personal knowledge that two Hispanic males, also known to him as "Sandy" and "Alex", were conducting the sale of cocaine in the city of Danbury, that both men facilitated the sale of cocaine by means of pager number 289-4343 (see above, 'the pager'), and that the sale of cocaine was conducted out of a white sports utility vehicle and a brown Honda Accord. (56(a)1 Statement ¶ 18). Informant #2 also told the defendants that "Sandy" lived in the area of Osborne Street, in Danbury (56(a)1 Statement ¶ 18), and that he had recently purchased cocaine from both "Sandy" and "Alex" on several prior occasions. (56(a)1 Statement ¶ 21).

3

Detective Trohalis met with Informant #2 a second time during the third week of October, 1999. At this second meeting, Detective Trohalis asked Informant #2 to make a controlled purchase of cocaine from either "Sandy" or "Alex". (56(a)1 Statement ¶ 22). Using the pager #289-4343, Informant #2 contacted "Sandy", and was instructed by "Sandy" to meet him at a location in Danbury. (56(a)1 Statement ¶ 23). Informant #2 told the detectives that it was routine for "Sandy" to not discuss money or cocaine amounts over the phone. (56(a)1 Statement ¶ 23). Informant #2 was under constant surveillance at the meet location. (56(a)1 Statement ¶ 24).

After waiting a short time, a white sports utility vehicle, bearing Connecticut dealer registration XP97 ('the SUV'), arrived at the location and pulled up to Informant #2. (56(a)1 Statement ¶ 25). Detective Trohalis observed Informant #2 lean into the driver's side window of the SUV and speak to the operator of the SUV. Detective Trohalis also had a clear, unobstructed look at the operator of the SUV as the SUV left the scene. (56(a)1 Statement ¶ 25). After the meeting, Informant #2 met with Detective Trohalis and turned over a clear, plastic bag, containing a white substance. (56(a)1 Statement ¶ 26). Informant #2 told Detective Trohalis that he had just concluded the purchase of cocaine from "Sandy". (56(a)1 Statement ¶ 26).

Detective Trohalis then drove with Informant #2 to 128 Osborne Street. Detective Trohalis observed the SUV arrive at the address. He also observed the operator park the SUV and walk-up a rear, exterior stairway and enter the second floor apartment. (56(a)1 Statement ¶ 27). Detective Trohalis describes the operator in the Affidavit and Application as a "heavy set Hispanic male with a closely shaved hair". (56(a)1 Statement ¶ 27). Detective Trohalis also conducted a field test on the white powder in the clear plastic bag. The white powder tested positive for cocaine. (56(a)1 Statement ¶ 28).

The defendant detectives checked the Danbury Police records to determine whether there were any incidents reported in reference to the second floor apartment of the 128 Osborne Street address ('the 128 residence). In so doing, the detectives confirmed that Angel Ramirez was a resident at that address. (56(a)1 Statement ¶ 29). Detective Trohalis also met with Informant #2 during the last week of October, 1999.

Detective Trohalis presented Informant #2 with a photograph of Angel Ramirez. Informant #2 identified Mr. Ramirez as "Sandy". (56(a)1 Statement ¶ 30).

### D.    The Third Controlled Purchase From Luis Fernandez.

Detective Trohalis met with Informant #2, once again, during the first week of November, 1999. Detective Trohalis asked Informant #2 to make another controlled purchase of cocaine from either "Sandy" or "Alex". (56(a)1 Statement ¶ 31). Informant #2 again contacted "Sandy" by means of the pager, and arranged to meet with him at a location in Danbury. (56(a)1 Statement ¶ 32). Informant #2 was again under constant surveillance by Detective Trohalis and Danbury Police Officer Chapman at the site of the location. (56(a)1 Statement ¶ 33). The detective and officer observed a Honda drive to the location, and watched as Informant #2 walked-up to the driver's side window and speak to the Honda's operator. (56(a)1 Statement ¶ 34).

After the Honda left the meeting, Informant #2 met with Detective Trohalis and turned over a prepackaged quantity of white powder/rock-type substance. (56(a)1 Statement ¶ 35). Informant #2 stated that he had purchased the substance from "Alex", and that "Alex" had several small packages of cocaine on his person at the time of the sale. (56(a)1 Statement ¶ 35). Informant #2 described "Alex" as, "a Hispanic male, thin build, approximately 160 lbs, approximately 5'6" tall, approximately 23 years of age, clean shaven, usually wears a baseball hat and has a large scar on the left cheek of his face." (56(a)1 Statement ¶ 36). Detective Trohalis conducted a field test on the substance and obtained a positive reaction for cocaine. (56(a)1 Statement ¶ 37).

While supervising these controlled purchases from "Alex" and Mr. Ramirez, the defendant officers and detectives had also been conducting day and night surveillance of the second floor apartment. (56(a)1 Statement ¶ 38). The defendants frequently observed both the Honda and the white SUV parked in the driveway to the apartment. (56(a)1 Statement ¶ 38). Detective Merullo frequently observed a heavy set Hispanic male exit the second floor apartment and drive off in the white SUV. (56(a)1 Statement ¶ 39). Detective Merullo also frequently observed a small Hispanic male enter and exit the second floor apartment of the 128 residence and operate both the Honda and the white SUV. (56 (a)1 Statement, ¶ 40).

### E.    The Fourth Controlled Purchase From Luis Fernandez.

Detective Trohalis decided to make yet another controlled purchase, this time through Informant #1. Proceeding in the same method as documented above, Informant #1 contacted the pager # 289-4343. (56(a)1 Statement ¶ 42). He received a return call from "Alex", and was directed to meet at a certain location in Danbury, this time in close proximity to the 128 Osborne Street address. (56(a)1 Statement ¶¶ 42, 43). Informant #1 stated that it was routine for "Alex" to withhold all discussion of money or amounts of cocaine while on the telephone. (56(a)1 Statement ¶ 44). At this time Detective Merullo was conducting surveillance of the second floor apartment. He observed both the white SUV and the Honda parked in the driveway of the apartment. (56(a)1 Statement ¶ 45). Detective Merullo further identified the white SUV, bearing dealer registration XP97, as being a Nissan Pathfinder. (56(a)1 Statement ¶ 46).

Informant #1 was constantly under surveillance while he was at the meet location. (56(a)1 Statement ¶ 47). At the same time Informant #1 was traveling to the meet location, Detective Merullo observed a small, thin Hispanic male leave the second floor apartment of the 128 residence and enter the white Nissan Pathfinder. (56(a)1 Statement ¶ 48). The SUV was also placed under continual surveillance, from the time it left the second floor apartment's driveway until its arrival at the meet location. (56(a)1 Statement ¶ 49). Detective Trohalis and Detective Merullo observed the meeting between Informant #1 and the operator of the SUV, and observed Informant #1 lean into the driver's side window of the SUV and speak to the SUV's operator. (56(a)1 Statement ¶ 50). As the SUV left the scene of the meet location, Detective Trohalis obtained a clear, unobstructed look at the operator. Detective Trohalis recognized the operator as "Alex". (56(a)1 Statement ¶ 51).

In keeping with past practice, Informant #1 met with Detective Trohalis, and turned over a clear plastic bag, containing a white powdered substance. Informant #1 confirmed Detective Trohalis' observation, and stated that he had made the purchase from "Alex". (56(a)1 Statement ¶¶ 52, 54). The substance field-tested positive for cocaine. (56(a)1 Statement ¶ 53).

**F.    The November 23, 1999, Unexecuted Search Warrant.**

On November 23, 1999, the defendant detectives and officers obtained a search and seizure warrant, specifically listing the Honda, the white SUV, the second floor

6

apartment at 128 Osborne Street, and the person of Angel Ramirez. (56(a)1 Statement ¶ 55). The defendants established surveillance of the second-floor apartment just prior to executing the November 23, 2000 warrant. During this surveillance the detectives noticed that the two targets of the investigation, Mr. Ramirez and Mr. Fernandez, were no longer operating the white Nissan Pathfinder and the Honda, but were instead using a green Plymouth Breeze (56(a)1 Statement ¶ 56). The defendant officers believed that the Plymouth Breeze was a leased or rental vehicle. (56(a)1 Statement ¶ 58). Based on their training and experience, the defendant officers believed "Alex" and Mr. Ramirez had changed vehicles in order to avoid detection by Law Enforcement. (56(a)1 Statement ¶ 59). The warrants were therefore not executed until further investigation was conducted, as Mr. Ramirez and "Alex" had altered the drug trafficking operation. (56(a)1 Statement ¶ 60).

### G.    The Fifth Controlled Purchase From Luis Fernandez And Angel Ramirez.

Just prior to the actual execution of the subject, January 6, 2000 warrant, during the first week of January 2000, Detective Trohalis met yet again with Informant #1, and asked Informant #1 to perform one last controlled purchase of cocaine from either "Sandy" or "Alex". (56(a)1 Statement ¶ 61). Informant #1 placed a call to the pager #289-4343, and was answered by "Sandy". (56(a)1 Statement ¶ 62). "Sandy" directed Informant #1 to a location, and the defendants provided Informant #1 with a prerecorded sum of Danbury Police evidence money, after searching Informant #1's person for drugs and/or money. (56(a)1 Statement ¶ 63).

Informant #1 was under constant surveillance by the defendants, Detective Trohalis, Detective Merullo, and Detective Ramos, as he proceeded to the meet location. Just prior to Informant #1's arrival, the defendant detectives once again observed the white Nissan Pathfinder, now bearing Connecticut registration 569NVH, waiting at the meet location. (56(a)1 Statement ¶ 65). The defendant detectives observed a meeting take place between Informant #1 and the persons in the white Nissan Pathfinder. (56(a)1 Statement ¶ 66). The defendants, Detective Merullo, Detective Ramos and Officer Murphy, maintained surveillance of the white Nissan Pathfinder and observed the vehicle leave the meet location and travel to 128 Osborne Street. (56(a)1 Statement ¶ 67). The defendant, detective Merullo, observed two

Hispanic males enter the second floor apartment. (56(a)1 Statement ¶ 68). Detective Merullo stated that these two males had been previously identified as Angel "Sandy" Ramirez and as "Alex". (56(a)1 Statement ¶ 68).

Detective Trohalis met with Informant #1 after the controlled drug purchase. Informant #1 turned over one clear plastic bag, filled with a white powdered substance. (56(a)1 Statement ¶ 69). The white powder was field tested, and positive reaction for cocaine was obtained. (56(a)1 Statement ¶ 70). Informant #1 told Detective Trohalis that he had met with "Sandy" and "Alex", that "Sandy" was driving, and that "Alex" was seated in the front passenger seat of the white Nissan Pathfinder. Informant #1 also stated that "Alex" had the cocaine in his lap, and that "Alex" handed the cocaine over to Sandy, who then sold the cocaine to Informant #1. (56(a)1 Statement ¶ 71).

### H.    Application For And Issuance Of The January 6, 2000 Search Warrant.

The defendant detectives applied for a search and seizure warrant a second time on January 6, 2000. In their January 6, 2000 application, the defendant detectives submitted that based on their five-month investigation, they believed probable cause existed that Angel Ramirez, also known as "Sandy", was selling cocaine in the City of Danbury. (56(a)1 Statement ¶ 75). The defendant detectives believed that probable cause existed that a Hispanic male known as "Alex", being 5"6 tall, thin build, and having a scar on his left cheek, was selling cocaine in the City of Danbury. (56(a)1 Statement ¶ 76). The defendants believed that both men were currently selling cocaine together in violation of Connecticut General Statutes §21a-279(a), the Possession of Cocaine, and Connecticut General Statutes §211-278(b), the Possession of Cocaine with Intent to Sell. (56(a)1 Statement ¶ 77). The defendant detectives also believed that "Sandy" and "Alex" used a telephone pager number, #289-4343, to facilitate the sale of cocaine, and that they used a white Nissan Pathfinder SUV, current CT registration 569NVH, to make deliveries of cocaine. (56(a)1 Statement ¶¶ 78, 79). And the defendant detectives believed that the second floor apartment at 128 Osborne Street, Danbury, CT was the residence of Angel Ramirez, and was used as a safe location to store the cocaine and the monies from the drug transactions, conducted by both Angel Ramirez and "Alex". (56(a)1 Statement ¶ 80).

8

The defendants, Detective Trohalis and Detective Merullo, signed the application on January 6, 2000. A neutral magistrate approved the application on January 6, 2000, and issued warrant, upon finding probable cause for the search and seizure of the second floor apartment at 128 Osborne Street; for the person of Angel Ramirez (56(a)1 Statement ¶ 81), and for "cocaine, white powdered substances, cutting agents for narcotics, grinders, packaging materials, weighing scales, strainers, U.S. currency, all financial records, safes, documentation of residence, records of identification, records of drug transactions, telephone pagers, and police scanners." (See January 6, 2000 Warrant Affidavit and Application) The plaintiff admits in his complaint that "the warrant for this investigation were obtained January 6, 2000, after review by a Judge of the Danbury Superior Court." (56(a)1 Statement ¶ 82, P.Comp., page 5).

**I.    Execution Of The Search Warrant For The Person Of Angel Ramirez.**

The defendant detectives and officers executed the search and seizure warrant on January 7, 2000. The defendants established surveillance of the 128 Osborne Street second-floor apartment at approximately 4:00 p.m. (569a)1 Statement ¶85). The defendants present at the surveillance included Detective Sgt. Fisher, Detective Ramos, Detective Merullo, Detective Krupinsky, Detective Trohalis, and Officer Murphy. (56(a)1 Statement ¶ 85). During the surveillance, Detective Merullo had a clear, unobstructed view of the driveway to the apartment. (56(a)1 Statement ¶ 86). Shortly after setting up surveillance, the defendants observed the white Nissan Pathfinder, bearing registration 569NVH, arrive and park in the 128 Osborne driveway. (56(a)1 Statement ¶ 86). They observed a small, thin Hispanic male, with a scar on his face, operating the white Nissan Pathfinder. (56(a)1 Statement ¶ 87). This male had been identified as "Alex" during the investigation. (56(a)1 Statement ¶ 87). The defendants observed "Alex" speaking on a cellular telephone, as he exited the vehicle. (56(a)1 Statement ¶ 88). Detective Merullo also observed "Alex" enter the second-floor apartment. (56(a)1 Statement ¶ 88).

The defendants maintained surveillance, and observed two Hispanic males exit the second-floor apartment a short time later. (56(a)1 Statement ¶ 89). The two Hispanic males were identified as Angel Ramirez and as "Alex". (56(a)1 Statement ¶ 89). Mr. Ramirez entered the operator's seat, and "Alex entered the passenger seat of

the Pathfinder. (56(a)1 Statement ¶ 90). The defendants maintained surveillance on the white Nissan Pathfinder as it left the 128 Osborne residence. (56(a)1 Statement ¶ 90).

The defendants observed the Pathfinder turn onto Tamarack Avenue. At this point the defendants decided to execute the search and seizure warrant for Angel Ramirez. (56(a)1 Statement ¶ 91). The defendants stopped the Pathfinder on Tamarack Avenue. The Pathfinder was pulled over at approximately 4:30 p.m. (56(a)1 Statement ¶ 92). The plaintiff, along with Mr. Ramirez, was patted down for weapons and/or contraband. No items were taken from the plaintiff's person at this time. (56(a)1 Statement ¶ 92) Both Mr. Ramirez and "Alex" were detained at this time. (56(a)1 Statement ¶ 92). The defendants took the keys from the ignition of the Pathfinder, and obtained a key to the second-floor apartment. (56(a)1 Statement ¶ 93). The defendants also noticed that Mr. Ramirez and "Alex" had a cellular telephone in their possession. (56(a)1 Statement ¶ 94).

### J.    Execution Of The Search Warrant For The Second-Floor Apartment.

Detective Trohalis, Detective Krupinsky, Detective Merullo, and Detective Sgt. Fisher immediately left the white Nissan Pathfinder on Tamarack Avenue, and returned to the 128 Osborne residence to execute the search warrant for the second-floor apartment. (56(a)1 Statement ¶ 95). Mr. Ramirez and "Alex" remained with Officers Selner, Murphy and Riolo in the parking lot of a nearby Mobil Station. (56(a)1 Statement ¶ 96). Detectives Krupinsky, Merullo, and Fisher used the key obtained from the ignition to open the door to the apartment at approximately 4:49 p.m. (56(a)1 Statement ¶ 97). During their surveillance, just prior to the warrant's execution, the defendants had not observed any persons, other than Mr. Ramirez and "Alex", entering and exiting the second floor apartment. No other persons were present in the second-floor apartment at the time of the warrant's execution. (56(a)1 Statement ¶ 97).

The second-floor apartment was found to consist of a kitchen, living room, a bedroom, bathroom, and an attic bedroom. (56(a)1 Statement ¶ 98). The bedroom was located off of the kitchen. The attic bedroom was accessed by a stair from the bathroom. (56(a)1 Statement ¶ 98).

Detective Sgt. Fischer and Detective Merullo conducted a search of the bedroom at approximately 4:55 p.m. This bedroom was identified as 'bedroom #1' in the

evidence flow chart. (56(a)1 Statement ¶ 101). Detective Sgt. Fischer found a Nike shoebox on the floor of 'bedroom #1', in plain view, between a closet and a tall dresser. (56(a)1 Statement ¶ 102). The Nike shoebox was found to contain the following: (1) one black plastic bag containing three clear ziplock bags, each containing a white rock-type substance, and having a combined weight of 15.2 ounces; (2) one black plastic bag containing a clear ziplock bag, containing a white rock-type substance and weighing 13.3 ounces; (3) one ziplock bag containing ten (10) smaller plastic bags, each containing white powder; (4) one electronic digital scale; (5) sixty-two (62) two dollar bills; and (6) various personal checks made out to cash. (56(a)1 Statement ¶ 102). Officer Krupinsky field-tested the bag containing 13.3 ounces of a white rock-type substance, and a positive reaction for cocaine was obtained. (56(a)1 Statement ¶ 103).

At this time the detectives in the second-floor apartment radioed back to Officer Murphy, and advised Officer Murphy to transport Angel Ramirez and "Alex" to Police Headquarters and place them in custody. (56(a)1 Statement ¶ 104). The interval of time, between the time when the white Nissan Pathfinder was stopped and the time when Mr. Ramirez and Mr. Fernandez were placed in custody, consisted of approximately thirty (30) minutes. (56(a)1 Statement ¶ 106). The defendants also advised Officer Murphy to have the white Nissan Pathfinder towed to Police Headquarters so that an attempt to seize the vehicle under State asset forfeiture could be conducted. (56(a)1 Statement ¶ 104).

The plaintiff admits in his complaint that the defendant detectives and officers acquired probable cause for his arrest during their execution of the search warrant: "***Probable Cause for arrest did not exist until the search was underway***." (56(a)1 Statement ¶ 105; Pl.Comp., page 17) (Emphasis provided).

The defendant detectives continued to search bedroom #1. The defendants located a gray metal box. The gray metal box contained $5,085, two electronic pagers, and a piece of mail addressed to Angel Ramirez at 128 Osborne Street, Danbury. (56(a)1 Statement ¶ 107). In addition to the gray metal box, the detectives uncovered one loaded, 9mm handgun, KBI Inc. brand, serial # B46120, located under the bed's mattress. (56(a)1 Statement ¶ 108).

11

The detectives also located additional ammunition, a passport for Angel Ramirez, a calculator, and an additional clear plastic bag containing a white rock substance, all lying upon a paper pad, placed on top of a small dresser. (56(a)1 Statement ¶ 109). These items lay out in the open, and could be clearly seen without having to remove or open any furniture. (56(a)1 Statement ¶ 109). The paper pad, itself, contained a list of drug records. (56(a)1 Statement ¶ 109).

A further search of bedroom #1 also uncovered $700 in U.S. currency, thirty-six (36) small plastic bags containing 1.2 ounces total of a white powdered substance, records of occupancy for Angel Ramirez and Moya Mercedes, additional digital scales, plastic bags for the packaging of narcotics, and a picture of Al Paccino as Tony Montana in the movie 'Scar Face'. (56(a)1 Statement ¶¶ 110-113). The detectives uncovered a further fifteen (15) small plastic bags, containing a white powdered substance, from the pocket of a shirt in bedroom #1. (56(a)1 Statement ¶ 112).

The detectives also searched the attic bedroom. The door to the attic bedroom was open and unlocked. (56(a)1 Statement ¶ 115). The detectives uncovered: (1) a plastic bag containing plant-like material; (2) $461 of U.S. currency; (3) records of occupancy for Luiz Fernandez at the 128 Osborne Street address; (4) a Spanish passport, passport # 007260, for a Luis Manuel Fernandez Arias; (5) a Florida Drivers License for Luis Fernandez; (6) a New York learner's permit for Luis Fernandez; (7) Dominican immigration papers under the name of Luis Fernandez; and  (8) a forty (40) page Metro Mobile cellular phone bill for Luiz Fernandez in the amount of $891. (**Exhibit C**)  The plaintiff has requested that the defendants admit that they took *HIS* passport, Florida Driver's License, and New York learner's permit from the 128 Osborne Street apartment. (56(a)1 Statement ¶¶116-123). The detectives also uncovered a Connecticut MVD title, MVD registration papers, and a social security card, all in the name of Luis Fernandez. (56(a)1 Statement ¶ 122).  The plant-like material was subsequently field-tested, and a positive reaction for marijuana was obtained. (56(a)1 Statement ¶ 116).

The defendant detectives concluded the search of the second-floor apartment at approximately 6:30 p.m. (56(a)1 Statement ¶ 124). Copies of the search warrant for

the 128 Osborne Street second-floor apartment and for the person of Angel Ramirez were left on the kitchen table. (56(a)1 Statement ¶ 124).

As a result of the execution of the search warrant, the defendants seized a total of $6,751 (six thousand, seven hundred fifty-one dollars) and a total of 30.2 ounces (just under two pounds) of high-grade cocaine. This cocaine had a total street value of approximately $140,000. (56(a)1 Statement ¶ 130).

The defendants also provided Mr. Ramirez and "Alex" with copies of the search warrant at Police headquarters. (56(a)1 Statement ¶ 126). The defendants uncovered $333 from Mr. Ramirez's person, and $46 from the plaintiff's person at Police Headquarters. (56(a)1 Statement ¶ 127). The $333, along with all other cash seized from the 128 Osborne Street apartment, were checked for the inclusion of Danbury Police evidence monies. One five dollar, taken from Mr. Ramirez's person, was identified as Danbury Police evidence money. (56(a)1 Statement ¶ 127). All seized monies were secured by Danbury Police and tagged as evidence. (56(a)1 Statement ¶ 127).

The defendants also seized a telephone pager from Mr. Ramirez's person. (56(a)1 Statement ¶ 128). This pager was identified as being telephone pager #289-4343, the pager number used to facilitate all controlled purchases during the five-month investigation. (56(a)1 Statement ¶ 128).

### K.    The Arrest, Charging And Sentencing Of Luis Fernandez.

Both Angel Ramirez and Luis Fernandez were processed without incident and held on $250,000 bond. (56(a)1 Statement ¶ 131). Luis Fernandez was charged with four counts: (1) possession of narcotics in violation of Connecticut General Statutes § 21a-279(a); (2) sale of certain illegal drugs in violation of C.G.S. § 21a-278(a); (3) possession of a controlled substance within 1,500 feet of a school/hsg/dy in violation of C.G.S. § 21a-278a(b); and (4) possession of a controlled substance greater than four ounces in violation of C.G.S. § 21a-279(c). (56(a)1 Statement ¶ 132). The plaintiff, Luis Fernandez, plead nolo contendere to Count 1, and was found guilty. (56(a)1 Statement ¶ 133). He received an eight year suspended sentence, with four years probation. (56(a)1 Statement ¶ 133).

### L.    The Reverse-Sting Operation.

After the plaintiff's arrest, and before his sentencing, the defendants conducted a reverse sting operation, using phone numbers recorded on the seized cell phone and pager (pager # 289-4343). This reverse sting operation further confirmed (in addition to the passport and drivers licenses) that "Alex" was the alias of Luis Fernandez. Both the cell phone and pager continually went off during the January 7, 2000 arrest, and for some days after the arrest. Detective Merullo made return calls to those numbers listed on the pager, and learned that these calls had been placed by people seeking to purchase cocaine from "Sandy" and "Alex". (56(a)1 Statement ¶¶ 134-35).

Specifically, on January 28, 2000 Detective Ramos investigated a page from "telephone # H". Detective Ramos and Detective Trohalis arranged to meet with the caller in a parking lot located on North Street in Danbury, and sold the caller a bag of white powder for $50. (56(a)1 Statement ¶ 139). After arresting the caller, the detectives presented the caller with a set of eight photographs of Hispanic males of similar likeness. Amongst this first set of photographs was a picture of Angel Ramirez. The caller identified the photograph of Angel Ramirez as being a picture of "Sandy". (56(a)1 Statement ¶ 140).

The detective presented the caller with a second set of eight photographs of Hispanic males of similar likeness. A photograph of Luis Fernandez was included in this second set. The caller identified the photograph of Luis Fernandez as being a picture of "Alex". (56(a)1 Statement ¶ 142). The caller also stated that he had purchased cocaine from "Alex" on numerous occasions. (56(a)1 Statement ¶ 142).

### M.    Luis Fernandez's Second Arrest And Subsequent Sentencing.

Not long after his January 7, 2000 arrest, the plaintiff, Luis Fernandez, resumed selling cocaine in Danbury, Connecticut. He was arrested on October 27, 2000. He was found guilty of multiple narcotics offenses on August 24, 2001, and received a 20-year sentence in addition to his past, suspended sentence. (56(a)1 Statement ¶ 144). Mr. Fernandez is currently serving a twenty-eight year prison term at the Connecticut Correctional Institution in Cheshire, Connecticut. The plaintiff's second arrest is not the subject of the present suit. (Pl.Comp.).

### N.    The Plaintiff's Suit Arising Out of His First, January 7, 2000 Arrest.

The plaintiff has brought a complaint against the defendants citing multiple causes of action under both the U.S. Constitution and the Connecticut state constitution. The plaintiff has not separated any of these various claims into individually numbered counts and paragraphs. (Pl.Comp.). The complaint is solely concerned with the event of his first, January 7, 2000, arrest. (Pl.Comp.).

The gravamen of the plaintiff's complaint appears to be that his Fourth Amendment rights were violated by the eight named police officers and detectives and by the Chief of Police due to his arrest on January 7, 2000. Specifically, the main thrust of the plaintiff's lawsuit and argument is that the defendants did not have probable cause for his arrest. Chief Paquette did not have any personal involvement in the five-month investigation, the application process for the warrant, nor for the warrant's execution. (See attached **Affidavit of Chief Paquette**).

The plaintiff has not indicated in his complaint whether he has sued the defendants in their individual or official capacities. (Pl.Comp). The plaintiff has not named the City of Danbury as a defendant. (Pl.Comp). However, the plaintiff appears to have attempted to allege a *Monell* style claim in the body of his complaint, setting forth allegations that the "municipal" and its "officials" failed to supervise the execution of the subject search warrants and the plaintiff's arrest, in accordance with policies, procedures and customs, which have not been identified by the plaintiff. (Pl.Comp). In addition, the plaintiff has alleged corresponding violations of Article I, Sections Seven, Eight and Twenty of the Connecticut State Constitution. (Pl.Comp).

The plaintiff's suit is entirely frivolous, as the defendants had probable cause for his arrest, and had meticulously documented the evidence for such probable cause in the warrant affidavit and application, and had executed the search warrant upon a finding of probable cause by a neutral magistrate. Regardless, the plaintiff's claim fails as the individual defendant officers and detectives are nonetheless protected by qualified immunity. In the alternative, assuming the plaintiff meant to sue the defendants in their official capacities (again, the plaintiff has not indicated so in his complaint – Pl.Comp.), the individual immunity afforded the defendants is imputed to the City of

Danbury. (Suing officers in their official capacity is the equivalent of suing the municipality – See *Brandon v. Holt*, 469 U.S. 464, 472, 105 S.Ct. 873, 878 (1985)).

In addition, the plaintiff has alleged violations of the U.S. Constitution's First (abridgment of freedom of speech); Fifth (substantive due process); Sixth (right to be informed of the nature and cause of the accusation); Eighth (cruel and unusual punishment); Ninth (disparagement of rights retained by the people); Thirteenth (involuntary servitude); and Fourteenth (equal protection, state due process) Amendments, and violation of Title VII. These claims also fail as a matter of law.

## II.    **LEGAL STANDARD OF REVIEW**

### **Summary judgment.**

Fed.R.Civ.P. 56(c) requires the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A factual dispute is "genuine" when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A "material fact" is one whose resolution will affect the ultimate determination of the case. *Id.* In determining whether a material issue of fact exists, the court must resolve all ambiguities and draw all inferences against the moving party. *Id.* at 255, 106 S.Ct. at 2513; *J.F. Feeser, Inc. v. Servi-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). However "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Samuels v. Smith*, 839 F.Supp. 959, 962 (D.Conn. 1993).

The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256, 106 S.Ct.

1570, 94 L.Ed.2d 763 (1987); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980).

When Rule 56(e) shifts the burden of proof to the non-moving party, that party must produce evidence to show the existence of every element that it bears the burden of proving at trial. *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir. 1987). Where evidence is submitted in support of, or in opposition to, a motion for summary judgment, such evidence must be presented in a manner consistent with its admissibility at trial. *See First National Bank of Clinton, Ill. v. Insurance Co. of North America*, 606 F.2d 760 (7th Cir. 1979) (in ruling on summary judgment motion, the district court properly relied on documents and exhibits identified by affidavit). Unsworn statements of the parties, letters addressed to litigants from third persons, and hearsay which does not fall under one or more of the exceptions listed in Rules 803-805 of the Federal Rules of Evidence, may not properly be considered. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Beyene v. Coleman Security Services, Inc.*, 854 F.2d 1179 (9th Cir. 1988); *Edward B. Marks Music Corp. V. Stasny Music Corp.*, 1 F.R.D. 720 (S.D.N.Y. 1941).

The nonmoving party "may not rest upon mere conclusory allegations or denials." See *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 101 (2d Cir. 1997) (internal citations omitted). On a motion for summary judgment, a court cannot try issues of fact; it can only determine whether there are issues to be tried. See *Anderson*, 477 U.S. at 255; *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987). The function of the court at this stage is not to weigh the evidence and determine what is true, but rather to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case

17

necessarily renders all other facts immaterial." *Id.* at 322-23. *Accord, Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d. Cir. 1995) (movant's burden satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim). See also *Schacht v. Wisconsin Dep't of Corrs.*, 175 F.3d 497, 503-04 (7th Cir. 1997).

## III.    LAW AND ARGUMENT

### A.    The Defendants Are Protected By The Defense Of Qualified Immunity.

The defendants are protected by the defense of qualified immunity.  The plaintiff has failed to prove that the execution of his arrest on January 7, 2000, by the defendant officers and detectives, violated clearly established statutory or constitutional rights, which a reasonable person would have been aware of.  As stated above, the gravamen of the plaintiff's complaint consists of a Fourth Amendment – lack of probable cause - claim.  Qualified immunity applies in the present case as: (1)  the defendants had probable cause for the plaintiff's arrest; and (2) even assuming that the defendants did not have probable cause for his arrest, the plaintiff fails to demonstrate how their actions rose to an unconstitutional level of "unreasonableness".

#### 1.    The defendants had probable cause for the arrest of the plaintiff.

The plaintiff fails to state an actionable claim under the Fourth Amendment. The Fourth Amendment states that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. AMEND. IV. The Fourth Amendment's "central requirement is one of reasonableness." *Illinois v. McArthur*, 531 U.S. 326, 330 (2001). In general, the Fourth Amendment requires that a state actor must obtain a warrant based on probable cause to lawfully execute a search. *See Camara v. Mun. Court of the City and County of San Francisco*, 387 U.S. 523, 528 (1967). "The existence of probable cause to arrest constitutes justification and is a complete defense to" such a claim. *Id*. Probable cause exists when an officer has "knowledge or reasonably trustworthy information of facts

and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.*

Upon close examination, the plaintiff fails to state a claim, under the Fourth Amendment, against the defendants, Chief Robert Paquette, Detective Sgt. Fisher, Detective Ramos, Detective John Merullo, Detective John Krupinsky, Detective Mark Trohalis, Officer Karl Murphy, Officer Selner, and Officer Riolo. The plaintiff's arrest followed the execution of a valid search warrant for the plaintiff's residence. The search warrant was based on a five-month investigation. This search warrant was issued upon a finding of probable cause by a neutral magistrate. (Local Rule 56(a)(1) Statement ¶ 2). Upon execution of the warrant, the fruits of the search established probable cause for the arrest of the plaintiff. The plaintiff has failed to show how the undersigned defendants' actions rose to a level of "unreasonableness", as required by a Fourth Amendment analysis.

      a.     **The search warrant, issued on January 6, 2000, was based on probable cause.**

"When reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant. " *U.S. v. Wilhelm*, 80 F.3d 116, 118 (4th Cir. 1996); citing to *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990). "In reviewing a magistrate's probable cause determination, our task is to determine whether the magistrate had a substantial basis for the decision... We will accord the magistrate's decision great deference, and will not invalidate a warrant by interpreting an affidavit in a hypertechnical, rather than a commonsense, manner." *U.S. v. Lalor*, 996 F.2d 1578, 1581 (4th Cir. 1993); citing to *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331 (1983).

"In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." *U.S. v. Lalor*, 996 F.2d 1578, 1582 (4th Cir 1993); citing to *Zurcher v. Stamford Daily*, 436 U.S. 547, 556 & n.6, 98 S.Ct. 1970, 1976-77 & n.6, 56 L.Ed.2d 525 (1978). "In *Anderson*, 851 F.2d 727, this court adopted the rule that "the nexus between the place to be searched and the items to be seized may be established by the nature

19

of the item and the normal inferences of where one would likely keep such evidence." *U.S. v. Lalor*, at 1582; citing to *United States v. Anderson*, 851 F.2d 727, 729-30 & n.1 (4th Cir. 1988).

A magistrate presented with a search warrant application must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit..., including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of crime will be found in a particular place." *U.S. v. Lalor*, 996 F.2d 1578, 1580 (4th Cir. 1993).

"The court held that probable cause can be inferred from the circumstances, and a warrant is not invalid for failure to produce direct evidence that the items to be seized will be found at a particular location." *U.S. v. Lalor*, at 1582; citing to *Anderson*, at 729. This is also known as the "totality of the circumstances" test. See *U.S. v. Wilhelm*, 80 F.3d 116, 119 (4th Cir. 1996). See *United States v. Corral*, 970 F.2d 719, 728 (10th Cir. 1992) (defendant's return to residence after negotiating purchase price but before actual exchange provides reasonable probability that cocaine was stored in residence); *United States v. Hawkins*, 788 F.2d 200, 204 (4th Cir.) (surveillance connected drug activity to defendant's residence).

A review under the "totality of the circumstances" test typically takes into account a comprehensive examination of those facts which are known to each and every officer involved in the investigation, as well as the sources of the officers' collective knowledge, including information obtained from informants. "Two factors are key to this (totality of the circumstances) analysis: the informant's veracity or reliability and his or her basis of knowledge." *U.S. v. Wilhelm*, 80 F.3d 116, 119 (4th Cir. 1996). "An important factor in determining whether an informant's report establishes probable cause is the degree to which it is corroborated." *U.S. v. Lalor*, at 1581; citing to Illinois v. Gates, at 241; *United States v. Miller*, 925 F.2d695, 698 (4th Cir. 1991). The *Lalor* court held that an informant's report met the standards of probable cause where the informant's information was corroborated by information from another informant, as well as by the police investigation, itself. *U.S. v. Lalor*.

The subject January 6, 2000 search warrant was the product of a five-month investigation, including numerous controlled purchases of cocaine from the plaintiff,

meticulously documented and recorded by the affiant-officers, the defendants Detective Merullo and Detective Trohalis. During the course of the five-month investigation, using the services of two confidential and reliable informants, the defendants learned that two men, known as "Alex" and "Sandy" were jointly conducting the sale of cocaine in the City of Danbury. They learned that "Sandy's" true name was Angel Ramirez, and that Mr. Ramirez resided in the second-floor apartment at 128 Osborne Street, Danbury.

While conducting surveillance, the defendants learned that "Alex" also resided at the 128 Osborne Street apartment, observing "Alex" enter and exit from the second-floor apartment on multiple occasions. Working with the two informants in an undercover capacity, the defendant detectives arranged the controlled purchase of cocaine from the targets of their investigation. During the controlled purchases, the defendants had also simultaneously maintained surveillance of the 128 Osborne Street apartment. The defendants observed both Mr. Ramirez and "Alex" leaving the second-floor apartment and proceeding to the arranged meet location for the controlled purchases.

Probable cause is particularly well established in this case as the warrant affidavit and application is founded upon the corroborating statements of two informants. Informant #1 and Informant #2's veracity and reliability are established by their mutually similar accounts. Both informants knew Mr. Ramirez and the plaintiff as "Sandy" and "Alex". Both informants stated that "Sandy" and "Alex" were jointly running a narcotics operation in Danbury, CT. Both informants stated that drug sales were facilitated by the use of a pager #289-4343. Both informants observed the plaintiff and Mr. Ramirez operating a white Nissan Pathfinder during their drug sales. Both informants gave consistently similar physical descriptions of the plaintiff and of Mr. Ramirez. In fact, the informants' statements so closely corroborate one another, that they both specifically take note of the fact that Mr. Ramirez and the plaintiff made it a practice of not discussing the price or amount of cocaine over the phone.

After a five-month investigation, and after carefully compiling a large amount of well-documented and well-preserved evidence, the defendants had every reason to believe that Mr. Ramirez and "Alex" were jointly conducting the sale of cocaine out of the 128 Osborne Street second-floor apartment, and that the apartment was being used

21

as a safe location to store cocaine and proceeds from drug transactions. Furthermore, the search warrant for the person of Angel Ramirez and for the second-floor apartment, was approved by a neutral magistrate of the Danbury Superior Court upon a finding of probable cause. The plaintiff has failed to show how the execution of the January 7, 2000 search was constitutionally unreasonable, as the totality of the circumstances clearly establish probable cause for the search.

      i.     **The search warrant was not insufficiently particular.**

The plaintiff has also attempted to challenge the validity of the January 6, 2000 search warrant by arguing that the warrant was "insufficiently particular". (Pl.Comp., page 11). Specifically, the plaintiff alleges that the warrant was insufficiently particular in that his attic bedroom was in fact a separate apartment, and that the warrant did not list this "attic apartment". (Pl.Comp., pages 11-12).

There is no evidence that the attic bedroom was a separate apartment. (See Arraignment Report and Affidavit). The key obtained from the white Nissan Pathfinder unlocked the door to the second-floor apartment. Upon entering, the detectives found that the apartment consisted of a kitchen, living room, bedroom, bathroom and an attic bedroom. (56(a)1 Statement ¶ 98). The door to this bedroom was open and unlocked. (56(a)1 Statement ¶ 115). The plaintiff admits in his complaint that he ate and slept in the second-floor apartment, and that he kept his personal effects in second-floor apartment. (56(a)1 Statement ¶ 8; Pl.Comp., page 8). The plaintiff has not submitted any evidence that his bedroom constituted a separate apartment; i.e. it had a separate address, a separate lock and key; and a separate and exclusive means of ingress and egress, as distinct from those for the second-floor apartment. There is and was no separate address for an "attic apartment" at 128 Osborne Street, Danbury, CT. Being part of the second-floor apartment, the attic bedroom clearly fell within the scope of the search.

      b.     **The inclusion of the plaintiff's alias in the search warrant application and affidavit did not effect the legality of the warrant.**

The plaintiff argues that the January 6, 2000 search warrant was invalid as it only identifies him by his alias, "Alex". The warrant affidavit and application consistently

documents the plaintiff's use of this alias during the five-month investigation that led to his eventual arrest on January 7, 2000. The plaintiff's argument is irrelevant. The fruits of the search, pursuant to the execution of the valid search warrant, gave rise to probable cause for the plaintiff's arrest. Nonetheless, the Fourth Amendment allows the police to place a suspect's alias within the body of a warrant. Inclusion of the plaintiff's alias in the warrant did not violate his Fourth Amendment rights.

"[A] warrant shall contain the name of the defendant or, if his name is unknown, any name or description by which he can be described with reasonable certainty." *Wong Sun v. United States*, 371 U.S. 471, 481 n.9 (1963). The court in *Brown v. Patterson*, 823 F.2d 167 (7th Cir. 1987), held that inclusion of an alias in a warrant is valid insofar as the warrant describes the suspect with reasonable certainty, and the police could show that they had a reasonable belief that the alias was in fact connected with the suspect,. The *Brown* court particularly approved of warrants where the alias was accompanied by a specific, physical description of the suspect. *Brown* at 169. The rationale behind the court's decision was that the warrant would therefore adhere to the "reasonable certainty" test. The court went on to reason that any rule forbidding the inclusion of an alias would be entirely counterproductive and would undermine the effectiveness of the entire criminal justice system. "The prudent thing to do was to make his alias available to all police officers in the area. If this is unreasonable, any person named in a warrant can avoid arrest indefinitely by the simple expedient of using an alias." *Brown* at 170.

As in *Brown*, the plaintiff was described with 'reasonable certainty' in the warrant affidavit and application. Two confidential informants gave corroborating statements as to the plaintiff's alias. Furthermore, both informants gave a similar description of "Alex", describing him as a small, Hispanic male. Informant #2 gave a particularly detailed description of "Alex", as a "Hispanic male, thin build, approximately 160 lbs, approximately 5'6" tall, approximately 23 years of age, clean shaven, usually wears a baseball hat and has a large scar on the left cheek of his face." Both affiant-officers, the defendants Merullo and Trohalis, had been able to get a clear look at "Alex" during the course of the controlled purchases. Specifically, Detective Merullo was able to identify "Alex" as the "small Hispanic male" that he frequently observed enter and exit the

23